FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

03 OCT -3 PM 2: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| EMPLOYERS MUTUAL | ) | |
| CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 03-PT-1119-M |
| | ) | |
| KENNETH EPPERSON; JONES, BLAIR, | ) | |
| WALDRUP & TUCKER, INC.; | ) | **ENTERED** |
| WINSTON BAUGHMAN; VICKIE | ) | |
| BAUGHMAN; TWIN CITY FIRE | ) | OCT 3 2003 |
| INSURANCE CO., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon plaintiff Employers Mutual Casualty Company's

("EMCC") Motion for Summary Judgment, filed on September 8, 2003.

**FACTS AND PROCEDURAL HISTORY**

On October 5, 2001, Winston and Vickie Baughman ("the Baughmans") filed a lawsuit in

the Circuit Court of Marshall County, Alabama ("the underlying lawsuit") against Jones, Blair,

Waldrup, and Tucker, Inc. ("Jones Blair") and Kenneth Epperson ("Epperson"), among others.[1]

The underlying lawsuit arose of out of an alleged injury Winston Baughman ("Mr. Baughman")

sustained on December 5, 2000 while employed by Gilco Contracting, Inc. at a work site in

Marshall County. Mr. Baughman was allegedly operating an American Auger horizontal earth-

boring machine[2] ("the auger machine") designed, engineered, manufactured and marketed by

---

[1] The underlying state court action is styled *Winston and Vickie Baughman v. Am. Augers, Inc., et al.,* CV 01-468-J.

[2] The machine's model number is 24-100, and its serial number is AB24100540100.

Astec Industries, Inc. and American Augers, Inc.  Pl. Ex. 4, Underlying Complaint at ¶¶ 14.  The Baughmans alleged in the underlying complaint that Jones Blair "was the engineering firm charged with responsibility for design and oversight of the subject job site in Marshall County, Alabama at the time of Winston Baughman's injuries."  *Id.* at ¶¶ 8, 49. The underlying complaint further alleged that Epperson is employed as a supervisor with Jones Blair and served as the On-Site Engineer Supervisor on the date of Winston Baughman's injuries.  *Id.* at ¶¶ 9, 49.

According to the underlying complaint, Mr. Baughman was operating the auger machine to bore under a paved road in Marshall County, under the direction and supervision of Rodney Camp (project supervisor and co-employee) and Epperson (on-site engineering supervisor).  The auger was allegedly comprised of a stationary engine and operator's platform with a rotating spiral auger attachment.  The auger machine was allegedly designed to force the rotating auger into the earth and to dig a tunnel approximately the same diameter as the auger attachment, while the engine and operator's platform remained stationary.  The auger machine operator stood on the operator's platform which was attached immediately rearward of the engine.  *Id.* at ¶ 16.

The underlying complaint alleged that the auger machine functioned improperly while Mr. Baughman was boring under the roadway, such that the rotating spiral auger became lodged and stopped turning.  When the rotating auger became lodged under the roadway, the Baughmans alleged, the rotational torque of the engine instantly caused the normally stationary engine and operator's platform to spin violently around.  As a result, Mr. Baughman has alleged that he was thrown from the auger machine and repeatedly trapped, pinned, and crushed between the auger machine and the ground, resulting in severe and permanent injury.  *Id.*

The Baughmans asserted negligence and wantonness claims against Jones Blair and

2

Epperson, alleging these defendants "were responsible for ensuring compliance with safe engineering practices and OSHA requirements for the subject job site" and "failed to correct known unsafe practices and OSHA safety violations occurring at the subject jobsite on the date of Winston Baughman's injuries." *Id.* at ¶¶ 50-51.  Furthermore, the Baughmans claimed, Jones Blair negligently and wantonly "failed to properly train and supervise Defendant Kenneth Epperson." *Id.* at ¶ 52.  Mrs. Baughman claimed against all defendants for loss of consortium. *Id.* at ¶¶ 50-52.[3]

EMCC, which is currently defending Jones and Epperson in the underlying lawsuit under a strict reservation of rights, filed this declaratory judgment action on May 13, 2003 asking the court, among other things, to declare that EMCC has no duty to indemnify Jones and Epperson in the underlying lawsuit and that Twin City Fire Insurance Co. ("Twin City"), which is also defending Jones Blair and Epperson in the underlying lawsuit, be deemed the primary insurer responsible for defense and indemnification.  On September 8, 2003, EMCC filed a motion for summary judgment based upon several insurance policies and the pleadings in both this lawsuit and the underlying lawsuit.[4]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

---

[3] The underlying complaint requested compensatory and punitive damages.

[4] EMCC supports its motion with the following evidence: (1) a certified copy of the EMCC Commercial General Liability Policy Commercial General Liability Policy Number 9D91852 ("the CGL Policy") to Jones Blair with effective policy period of May 1, 2000 to May 1, 2001 (Pl. Ex. 1); (2) a certified copy of the EMCC Commercial Umbrella Liability Policy Number 9J91852 ("the Umbrella Policy") to Jones Blair with effective policy period of May 1, 2000 to May 1, 2001 (Pl. Ex. 2); a copy of the Hartford, Twin City Fire Insurance Company's Architects' and Engineers' Professional Liability Policy No. NPCo163574-00 ("the Twin City policy") with effective policy period of September 26, 2000 to May 25, 2003 (Pl. Ex. 3); and the underlying complaint in *Winston and Vickie Baughman v. Am. Augers, Inc.*.

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.      Plaintiff's Position

EMCC asserts that it owes no duty to defend and/or indemnify Jones Blair and Epperson for claims asserted against them in the underlying lawsuit and is not required to satisfy any judgments against Jones Blair and/or Epperson. Specifically, EMCC contends, EMCC policies issued to Jones Blair do not provide coverage for defense and/or indemnification to Jones Blair and/or Epperson for the claims asserted by the Baughmans in the underlying lawsuit.

### A.      The EMCC CGL Policy

The CGL policy issued to Jones Blair provided that the insurer will pay those sums the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which the insurance applies. Such "bodily injury" or "property damage" must be caused by an "occurrence."    Furthermore, EMCC alleges, the CGL policy exclusion entitled "The Engineers, Architects or Surveyors Professional Liability Exclusion" reads:

> The insurance does not apply to "bodily injury," "property damage," "personal injury"or "advertising injury" arising out of[5] the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity. Professional services include:
> 1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
> 2. Supervisory, inspection, architectural or engineering activities.

---

[5]  EMCC contends that the term "arising out of" has been construed very broadly. *See, e.g., Taliaferro v. Progressive Specialty Ins. Co.*, 821 So. 2d 976 (Ala. 2001)(stating "[t]he term 'arising out of the use' in liability policies has generally been held to be a broad, comprehensive term meaning 'origination from,' 'having its origin in,' 'growing out,' or 'flowing from.'" (citation omitted); *State Farm Fire and Cas. Co. v. Erwin*, 393 So. 2d 996 (Ala. 1981)(citation omitted); *Pacific Indem. Co. v. Run-A-Ford Co.*, 161 So. 2d 789 (Ala. 1964).

In the CGL declaration pages, EMCC contends, Jones Blair expressly stated its profession as "engineering contractor." Importantly, EMCC argues, the Baughmans' allegations against Jones Blair and Epperson arise out of the "rendering of or failure to render any professional services" by Jones Blair or "any engineer" (Epperson) employed by Jones Blair or performing work on its behalf. Thus, EMCC contends, such allegations fall under this CGL exclusion.[6] EMCC also notes that the CGL exclusion covers "supervisory, inspection, architectural or engineering activities," which relate to the Baughmans's negligent and wanton training/supervision claims.

EMCC draws the court's attention to *Allstate Ins. Co. v. Sellers-Bok, M.D.*, 942 F. Supp. 1428 (M.D. Ala. 1996), a declaratory judgment action which EMCC contends involved a "professional services" exclusion almost identical to the one at issue.[7] In *Sellers-Bok*, an insured psychiatrist who believed her patient (a minor) had been sexually abused by the patient's father published those findings in a report which led to the father's arrest. The father's lawsuit against the psychiatrist claimed abuse of process, malicious prosecution, libel, slander, invasion of privacy, intentional infliction of emotional distress, outrage, filing of a false report, malpractice, breach of a fiduciary duty, and civil conspiracy. Finding that the professional services exclusion covered the underlying claims, the court focused on the plaintiff's repeated averments that "at all relevant times, Dr. Sellers-Bok was acting in her capacity as a professional psychiatrist and that her work product and methods were in breach of professional and fiduciary duties owed to them by Dr. Sellers-Bok."

---

[6] The court discussed these facts earlier in this memorandum opinion.

[7] The Allstate policy at issue in *Sellers-Bok* excluded "[a]ny accidental event [or] personal injury . . . arising out of the rendering of or the failure to render . . . professional services . . . ." *Id.* at 1432.

6

*Id.* at 1433.[8]  Similarly, EMCC contends, all allegations against Jones Blair and Epperson are premised upon their status as an engineering firm and engineer, respectively, and, but for that status, "neither would have qualified to perform the requisite professional engineering services requested for this job site."

Moreover, EMCC argues, the Eleventh Circuit addressed this exclusion in the context of an umbrella policy. *See American & Foreign Ins. Co. v. Colonial Mortgage Co., Inc.*, 936 F.2d 1162 (11th Cir. 1991).  In that case, EMCC contends, the umbrella carriers sought a declaratory judgment against the insured mortgage company to determine the extent of the carrier's contractual obligations to its insured.  Granting the umbrella carriers's motion for summary judgment, the trial court determined that the insured was not entitled to insurance coverage because of the professional service liability exclusion in the policies.[9]  The Eleventh Circuit affirmed the lower court's ruling

---

[8] Addressing the insured's contention that the civil conspiracy claim was covered, the court found:

> Dr. Sellers-Bok's characterization of such acts as negligent or part of a conspiracy does not change the fact that **these alleged acts relate to, and are premised upon, her status as a psychiatrist.**
> Each of Dr. Sellers-Bok's alleged acts representing the eleven counts in the [underlying case] are clearly professional in nature, requiring specialized knowledge, skill and training.  But for Dr. Sellers-Bok's professional status, she would not have been qualified to perform a psychiatric evaluation of [the minor child] and record such findings, nor would she have been competent to publish her professional opinions.  As such, this court finds that each claim advanced against Dr. Sellers-Bok in the [underlying case] is unambiguously excluded from the Policy's coverage because of the "Professional Services Exclusion."

*Id.* at 1434. (Emphasis added).

[9] The exclusions in *Colonial Mortgage* provided:

> MORTGAGE COMPANY PROFESSIONAL LIABILITY EXCLUSION
> This policy does not apply to any professional liability arising out of the insured's profession as a mortgage company.
> "Professional liability" as used in this endorsement, means liability arising out of the insured's profession as stated above and caused by the rendering or failure to render professional services for others, including professional services of any employee of the insured or of any person for whom the insured is legally liable.  All other terms and conditions of this policy remain unchanged.

on separate grounds.  The Eleventh Circuit found:

> Because the complaint there [in *Correll v. Fireman's Fund Ins. Co.*]
> alleged only intentional acts of forgery, embezzlement, intentional or wanton
> conversion, breach of contract, tortious bad faith, breach of
> contract and outrageous conduct, the court held that the professional liability
> policy did not insure against the acts alleged.  Similarly, here, the professional
> liability exclusion does not determine the umbrella carrier's liability for injury
> resulting from Colonial's intentional acts.  Rather, Alabama law and public policy
> dictate that the carrier has no duty to its insured to indemnify Colonial for
> intentional acts.

*Colonial Mortgage Co., Inc.*, 936 F.2d at 1166.[10]  EMCC further highlights the concurring opinion,

which analyzed the professional service exclusions, found each of them to be unambiguous and

applicable, and reasoned that since Colonial's profession was expressly stated to be "a mortgage

company," "professional services, in this context, necessarily means services Colonial provided as

a mortgage company." *Id.* at 1168.  EMCC argues in light of the caselaw and the facts, i.e., Jones

Blair is an engineering contractor, professional services necessarily means the services Jones Blair

provides as an engineering contractor, and these services include properly training and supervising

---

(Emphasis added).

PROFESSIONAL LIABILITY EXCLUSION
This policy does not apply to any professional liability claims <u>arising out of</u> any
of the insured's activities. "Professional liability," as used in this endorsement,
means liability <u>arising out of</u> and caused by the rendering or failure to render
professional services for others; including professional services of any employee
of the insured or of any other person for whom the insured is legally liable. All
other terms and conditions of this policy remain unchanged. (Emphasis added).

[10] This court notes the Eleventh Circuit's holding:

Because we hold, as a matter of Alabama law and public policy, that the umbrella carriers'
policies cannot extend coverage to the intentional and fraudulent acts of Colonial in its
dealings with the Fords and Walls, we need not decide whether the district court correctly
determined that Colonial's acts were excluded from coverage because they arose out of
'professional services' rendered as a mortgage company.

*Id.* at 1165.

8

engineers on job sites, the EMCC professional liability exclusion applies here.

EMCC distinguishes an Alabama Supreme Court opinion which did not uphold a version of this exclusion. *See United States Fidelity and Guaranty Co. v. Armstrong*, 479 So. 2d 1164 (Ala. 1985). In that case, EMCC argues, the trial court found that the insurer had a duty to defend construction company, city, and engineering firm (the engineering firm was an additional insured under the city's general liability policy), despite the professional services exclusion in the city's policy. In affirming the trial court, EMCC argues, the Alabama Supreme Court addressed the inapplicability of the professional services exclusion to the engineering firm as follows: "We can find no allegation as to 'the rendering of or the failure to render any professional services.'" *Id.* at 1168. EMCC further observes that the Supreme Court relied upon testimony by the engineer acknowledging that some of the engineering company's functions were professional services within the exclusion and others were not. EMCC argues:

> The [*Armstrong*] Court held that the insurer had a duty to defend, in light of the claim for damages due to nonprofessional services, but the court noted that the insurer would not be required to indemnify for damages caused by professional services. The court concluded that it was not in a position to decide, as a matter of law, whether an activity constituted a 'professional service' because the particular activity out of which the liability arose was unidentified due to the posture of the case.[11]

---

[11] Specifically, the *Armstrong* court found:

Whether the actions of [the engineering company or engineer] which allegedly damaged Ms. Armstrong were professional services within the exclusion is a question of fact. Since no specific findings of fact were made by the trial court, "this Court will assume that the trial court found those facts necessary to support its judgment, unless those findings would be clearly erroneous and against the great weight of the evidence." (Citation omitted). Because there are facts that support the trial court's judgment, that judgment is not clearly erroneous or against the great weight of the evidence . . . . [T]he trial judge properly found USF&G under a duty to pay for any damage the factfinder in the underlying action may find to have been caused by the non-professional services of these two defendants."

*Id.* at 1169.

EMCC contends that *Armstrong* has been strongly criticized.[12] Furthermore, EMCC distinguishes *Armstrong* based on the fact that the Baughmans' underlying complaint specifically alleges negligence and wantonness involving the rendering of or failure to render professional services.[13] The Baughmans' claims, EMCC argues, arise out of the rendering of professional engineering services and the training and supervision of a job site supervisor regarding engineering services. Additionally, EMCC contends, the *Armstrong* opinion did not provide the specific policy provisions and complaint allegations, whereas here the specific language at issue warrants application of the exclusion.[14]

EMCC further relies upon *Tanner v. State Farm Fire & Casualty Co.*, 2003 WL 21771769 (Ala. 2003)[15] and a number of other cases which it contends have upheld similar versions of the exclusion at issue in this case.[16] EMCC highlights *American Motorists*:

---

[12] EMCC contends that *Armstrong* was disagreed with by *Porterfield v. Audubon Indem. Co.*, 2002 WL 31630705 (Ala. Nov. 22, 2002), declined to extend by *Shalimar Contractors, Inc. v. Am. States Ins. Co.*, 976 F. Supp. 1450 (M.D. Ala. 1997), and distinguished by *Am. Motorists Ins. Co. v. Gen. Host Corp.*, 667 F. Supp. 1423 (D. Kan 1987). This court notes that the cases cited by EMCC distinguished *Armstrong* on grounds separate from the professional services exclusion at issue in that case.

[13] These facts are addressed earlier in this memorandum opinion.

[14] The court observes that *Armstrong* does quote the specific language of the professional services exclusion. *Id.* at 1168.

[15] *Tanner* involved an insurer's duty to defend and/or indemnify an insured partner (Tanner) and his partnership (Tanner and Tanner & Co.) from a co-partner's (Mitchell) claims that Tanner committed accounting malpractice, among other things. The trial court applied the professional services exclusion to preclude coverage of Mitchell's claims for intentional conduct and granted insurer's motion for summary judgment. In determining whether State Farm owed a duty to defend Tanner and Tanner & Co., the Alabama Supreme Court relied upon a previous opinion holding that Mitchell's accounting malpractice claim arose out of Tanner and Mitchell's relationship of accountant and client, whereas Mitchell's other claims arose out of their partnership relationship. The Alabama Supreme Court affirmed the grant of summary judgment for State Farm on the accounting malpractice claim. Unlike *Tanner*, EMCC argues, the only relationship between the Baughmans and defendants Jones Blair and Epperson relates to professional services furnished by the engineering firm and the engineer on this job. Thus, EMCC contends, the professional services exclusion should apply as it did in *Tanner*.

[16] *See Am. Motorists Ins. Co. v. S. Sec. Life Ins. Co.*, 80 F. Supp. 2d 1285 (M.D. Ala. 2000)(applying Florida law to hold that a professional services exclusion applied because professional acts performed by an insured

> In this case, the professional acts performed by Southern Security and its agents were the sale and preparation of insurance policies. In selling the insurance policies to Howard and the Olivers, Southern Security and its agents made representations about the terms and conditions of the insurance contracts – a pursuit which involves professional activity. Furthermore, the damages allegedly suffered by the Olivers and Howard arose directly from the performance of those professional services. If Southern Security and its insurance agents had performed no professional services relative to the sale and marketing of insurance products, the Olivers and Howard would have incurred no injuries.

*See Am. Motorists* at 1289.

EMCC repeats that the Baughmans' negligence and wantonness claims against Jones Blair and Epperson all arise out of the rendering or failure to render professional engineering services. The negligent and wanton training and supervision claim, EMCC argues, "also arises out of the rendering or failure to render professional services because the alleged negligent and wanton acts relate to and are premised upon the insured's status as an engineering contractor and the duties it owed as an engineering contractor to train and supervise its engineering employees."

### B.    The EMCC Umbrella Policy

The "Professional and Excluded Occupations Liability Exclusion (Absolute)" from the Umbrella Policy reads: "This policy does not apply to any liability, cost or expense <u>arising out of</u> your 'professional liability' or 'excluded occupations liability' or for such liability for which one of your employees or any person you are responsible for is liable." The Umbrella Policy defines "professional liability" as "liability <u>arising out of</u> the rendering or failure to render

---

and its agents were the sale and preparation of insurance policies and the damages allegedly suffered by the underlying plaintiffs arose directly from the performance of those professional services); *Prisco Serena Sturn Architects, Ltd v. Liberty Mutual Ins. Co.*, 126 F.3d 886 (7ᵗʰ Cir. 1997); *Marcel v. Becnel*, 691 So. 2d 1344 (La. Ct. App. 1997); *Commercial Union Ins. v. Walbrook Ins. Co., Ltd.*, 7 F.3d 1047 (1ˢᵗ Cir. 1993); *In re Reinforced Earth Co.*, 925 F. Supp. 913 (P.R. 1996); *Centennial Ins. Co. v. Neyer, Tiseo and Hindo, Ltd.*, 523 N.W. 2d 808 (Mich. App. 1994); *Fidelity & Cas. Co. of New York v. Envirodyne Eng'rs, Inc.*, 461 N.E.2d 471 (Ill. App. Ct. 1983)

11

a service relating to a profession in a manner which is reasonable and in keeping with the standards of that profession and formal accreditation. This includes but is not necessarily limited to professionals such as . . . [a]rchitects, engineers, surveyors, or draftsmen." (Emphasis added).

In light of *Colonial Mortgage* (involving an umbrella policy) and the other analyzed cases, EMCC contends, identical applicability issues arise with respect to CGL and umbrella policies. EMCC argues that it is entitled to summary judgment on the insurance coverage issues in this case. EMCC concludes by requesting a court order finding EMCC has no duty to defend or indemnify Jones Blair and/or Epperson for the claims asserted against those defendants in the underlying lawsuit, and EMCC is thus not required to satisfy any judgment entered against Jones Blair and/or Epperson.

## 1. Defendants' Positions

Defendants take no official positions on EMCC's motion for summary judgment.

## CONCLUSION OF THE COURT

The court assumes that the responses filed by the defendants reflect that they do not oppose the plaintiff's said motion for summary judgment. Said motion will be granted. Plaintiff will submit and serve a proposed judgment within 10 days. The defendants will have 7 days to respond as to form, etc.

This _____3rd_____ day of October, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

12